# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**NICOLE R. GORDON,**

      **Plaintiff,**

                                 **Civil Action 2:14-cv-1769**
     **v.**                           **Judge Gregory L. Frost**
                                 **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Nicole R. Gordon, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for social security disability insurance benefits and supplemental security income. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 12), the Commissioner's Memorandum in Opposition (ECF No. 15), Plaintiff's Reply (ECF No. 17), and the administrative record (ECF No. 11). For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.    BACKGROUND

Plaintiff filed her applications for benefits on November 4, 2010, alleging that she has been disabled since January 1, 2010, due to a total knee replacement in her right knee, constant pain in her back and hips, insomnia, depression, bulimia, and anorexia. (R. at 264-67, 268-73, 294.) Plaintiff's applications were denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge. Administrative Law Judge Joseph L. Heimann ("ALJ") held a video hearing on February 22, 2013, at which Plaintiff, represented by counsel, appeared and testified. (R. at 57-87, 89-90.) Darrell W. Taylor, a vocational expert, also appeared and testified at the hearing. (R. at 88, 91–98.) On April 4, 2013, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 27-44.) On February 14, 2014, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 4-7.) Plaintiff then timely commenced the instant action.

## II.    HEARING TESTIMONY

### A.    Plaintiff's Testimony

Plaintiff testified at the administrative hearing that she lives in a duplex apartment with her six-year-old son. (R. at 57.) She indicated that her duplex has at least 23 stairs. (R. at 60.) She testified that she takes care of her son, who suffers from attention deficit hyperactivity disorder ("ADHD") and oppositional defiant disorder ("ODD"). Plaintiff stated that she drives her son to school and also sometimes picks him up and added that the drive is approximately three-to-five minutes. Plaintiff indicated that her mother helps with her son approximately 20-24 hours per week in the form of picking him up and taking him to Taekwondo four times per week and having him spend the night on Friday nights. (R. at 59.)

2

Plaintiff testified that she has worked as a dental assistant and held several other medical-related jobs.  She said that she most recently worked at Massey's pizza, where she did "a little bit of everything," including running the register, making pizzas, and opening and closing.  (R. at 60-62.)  She said that she ended up leaving this last job because her employers were saying inappropriate things to her and taking advantage of her.  Plaintiff indicated that she has survived financially on her son's disability income, food stamps, subsidized housing, and assistance from her mother.

Plaintiff testified that she cannot work because she cannot leave her house without having a panic attack accompanied by vomiting and diarrhea.  (R. at 65.)  She stated that she "cannot bring [her]self to walk out the door."  (R. at 66.)  When asked why she was able to work successfully for a number of years and now could not, Plaintiff replied that since a car accident, she has had problems with back pain and that her knee is worse after the knee-replacement surgery.  She said that even if her mental health was fine, her back and knees would not allow her to work.  (*Id*.)  Plaintiff believed she could walk maybe a block.  (R. at 74.)  At the time of the hearing, Plaintiff testified that she weighed 248 pounds.  (R. at 75.)  Plaintiff stated that she is able to grocery shop if she goes with her mother.  (R. at 76.)  Plaintiff explained that her mother is there to watch the cart in case she has a panic attack and needs to go to the restroom. She added that she also continuously gets hernias.  Plaintiff indicated that she does not use a cane but that she will grab onto things such as railings when walking up steps or sometimes crawl up the steps with her hands if her knees really hurt.

When asked why she attended a functional capacity evaluation, Plaintiff testified that her lawyer asked to get a statement from her treating physician, Dr. Dyar, who in turn sent Plaintiff

to the functional capacity evaluation.  (R. at 68-69.)  Plaintiff testified that a nurse filled out at least part of this form based on answers to the questions she provided over the telephone.  (R. at 70.)

Plaintiff testified to experiencing daily swelling in her knees for which her doctors recommended ice packs, but indicated that ice packs hurt and are not comfortable.  (R. at 79.)  She stated that her doctor also prescribed Mobic, a non-steroidal anti-inflammatory medication, but that she does not take it because she does not like the way it makes her body feel.  (*Id.*)  Plaintiff also indicated that she has refused injections recommended by Dr. D'Onofrio, her treating orthopaedic surgeon, because of her fear of needles.  (R. at 80.)

Upon questioning by her attorney, Plaintiff stated that she could not perform a sedentary type job because of pain from her legs, back, and hernias.  (R. at 82.)  She added that she also has regular migraines and that her medications cause dizziness and drowsiness.  She says she needs to lay down for three more hours after taking her son to school.   Plaintiff testified that she "can't leave" her house "at least 14 days" out of each month.  (R. at 84.)

**B.     Vocational Expert Testimony**

The vocational expert ("VE") testified at the administrative hearing that Plaintiff's past employment include a home health attendant, performed as a medium, semi-skilled position; a medical assistant, performed as a light, skilled position; and a dental assistant, also performed as a light, skilled position.  (R. at 89-95.)  The VE testified that Plaintiff's past relevant work does not contain skills that transfer to the sedentary level of exertion.  (R. at 95.)

The ALJ proposed a series of hypotheticals to the VE premised upon the residual functional capacity ("RFC") that he ultimately determined for Plaintiff.  (R. at 95-97.)  The VE

4

testified that an individual with Plaintiff's age, education, and work experience and with the RFC ultimately determined by the ALJ could perform approximately 50,000 jobs at the sedentary exertion level in the national economy, including jobs such as a hand packer and an assembler. (R. at 97.)  The VE further testified that if Plaintiff missed three or more days of work per month or was off task 20% of the work day in addition to regular breaks, she would not be able to sustain employment.  (*Id.*)

Upon examination from Plaintiff's counsel, the VE testified that if Plaintiff needed to recline or lay down 50% of the work day, she would not be able to sustain employment.  (R. at 98.)

### III.    MEDICAL RECORDS

**A.    Physical Impairments**

**1.    Theresa A. Dyar, D.O.**

Although Dr. Dyar began treating Plaintiff on December 28, 2011, (R. at 954), the first treatment note from her office reflects a January 17, 2012 visit.  During this visit, Plaintiff complained of headaches, but was otherwise noted to have a normal physical and psychiatric exam, with normal mood and affect.  (R. at 932-38.)  Dr. Dyar prescribed medication and made a note to refer Plaintiff to a neurologist if the headaches did not resolve.  (*Id.*)

In February 2012, Plaintiff presented to Dr. Dyar with complaints of tremors and back pain.  (R. at 917.)  Upon physical examination, Dr. Dyar indicated Plaintiff was in no acute distress, had normal musculoskeletal findings, and displayed a normal gait and station with no unsteadiness.  Dr. Dyar also noted normal findings on her psychiatric exam of Plaintiff and noted

that she did not observe a tremor.  (R. at 918-19.)  She referred Plaintiff to a neurologist.  (R. at 919.)

In April 2012, Plaintiff presented to a neurologist for evaluation of tremors.  (R. at 912.)  In a letter to Dr. Dyar, the neurologist noted that Plaintiff reported that the tremor did not interfere with her eating or handwriting, but did interfere with her reading.  The neurologist diagnosed benign essential tremor, suggested potential adjustments in Plaintiff's psychiatric medication or a vitamin B supplement, and noted no follow-up appointment was necessary.  (R. at 912-16.)

Plaintiff presented to Dr. Dyar in May 2012 for treatment a potential breast infection.  (R. at 905.)  Dr. Dyar noted that was in no acute distress and displayed a normal mood and affect.  (R. at 906.)  Plaintiff failed to attend a scheduled appointment in July 2012 and next saw Dr. Dyar on September 7, 2012, and again complained of headaches, which she reported moderately limited her activities.  (R. at 888, 894.)  She described Plaintiff as "in no acute distress" and as having a normal psychiatric exam.  (R. at 889.)  She made a note to check with Plaintiff's psychiatrist to see if it was okay to treat Plaintiff with the medication Topomax. (R. at 890.)

On February 16, 2012, Plaintiff underwent cervical, thoracic, and lumbar spine x-rays.  The cervical spine appeared to be in normal alignment, with only a slight narrowing of the C6-7 interspace level.  The thoracic and lumbar areas of the spine showed a slight scoliosis, but it was noted that because the images of the spine were not taken upright with the patient standing, the measurements given for the scoliosis may not be accurate.  (R. at 777-78.)  The vertebral bodies otherwise appeared to be in normal alignment, with mild spondylitic degenerative changes

throughout the spine and a narrowing of the L4-5 interspace level "probably due to degeneration of the disc at this level." (*Id.*)

When seen by Dr. Dyar on October 4, 2012, Plaintiff complained of back pain, which Plaintiff reported had started two weeks prior, moderately limited her activities, and was alleviated by rest and medication. (R. at 881.) On examination, Dr. Dyar found decreased range of motion, an antalgic gait, and positive straight-leg raise test on her right leg, but normal reflexes. Dr. Dyar ordered x-rays of Plaintiff's spine and physical therapy if the x-rays were normal. (R. at 881-86.)

On February 20, 2013, Dr. Dyar completed a functional capacity assessment. (R. at 952-54.) Dr. Dyar listed Plaintiff's symptoms as anxiety/depression, back pain, knee replacement, and leg spasm. Dr. Dyar opined that these conditions made Plaintiff "unable to work." (R. at 952.) Dr. Dyar also opined, based on the WorkLife functional capacity evaluation, that Plaintiff could sit for three hours in a work day, for only thirty minutes at a time; stand or walk for one hour in an eight hour workday for only ten minutes at a time, but could not walk even a single city block; that she could lift no more than ten pounds occasionally; and that she would require daily unscheduled breaks. Dr. Dyar failed to express an opinion to the question on the form asking whether Plaintiff was a malingerer. (R. at 953.) Dr. Dyar wrote that Plaintiff had 90% limitation in her hands and fingers for handling or fingering and a 50% limitation in her arms for reaching. (R. at 953.) Dr. Dyar wrote that it was her opinion that Plaintiff has had these limitations since she began treating her in December 2011.

On February 27, 2013, Dr. Dyar clarified that the assessment she completed "was filled out with the direct recommendations from the Functional Capacity Exam that she

completed at Worklife on January 29, 2013." (R. at 959.) She also added that her "answers to the Residual Functional Capacity Questionnaire were pulled directly from the FCE report which [she] received from Worklife." (*Id*.)

### 2. Timothy J. Custer, M.D.

On June 20, 2012, Plaintiff presented to Dr. Custer with complaints of a possible recurrent hernia. Plaintiff complained of abdominal pain, but denied vomiting and diarrhea. (R. at 897.) Upon physical examination, Dr. Custer noted that Plaintiff "ambulates without difficulty," was "able to stand without difficulty," and was in no acute distress. (R. at 897-98.) Dr. Custer concluded that no obvious hernias were detectable. Dr. Custer indicated that he intended to proceed with laparoscopy in an effort to discern the etiology of Plaintiff's alleged pain. (R. at 898.)

### 3. Mark M. D'Onofrio, M.D.

Plaintiff treated with Dr. D'Onofrio beginning in 2010 for right knee issues (R. at 597-607), including a right-knee arthroscopy with partial lateral meniscectomy (R. at 618-19), right total knee replacement in August 2010 (R. at 613-15), and right knee manipulation surgery in November 2010. (R. at 611-12.)

On December 13, 2012, when seen for evaluation of her right hip pain, Dr. D'Onofrio found that Plaintiff has full range of motion in her lower back and 5/5 motor strength in her legs. Dr. D'Onofrio found tenderness directly over the greater trochanter that did recreate her pain and that radiated down her lower extremity. An MRI of Plaintiff's hip reflected normal findings. (R. at 861.) Plaintiff was diagnosed with right hip bursitis and physical therapy was recommended. (R. at 864.)

In May 2012, Plaintiff saw Dr. D'Onofrio with complaints of shoulder pain and possible rotator cuff injury.  The X-rays showed normal findings, and Dr. D'Onofrio diagnosed probable rotator cuff tear and ordered an MRI.  (R. at 868.)  The MRI showed a possible spur and potential chronic tendinopathy, but an "[o]therwise normal study" and no evidence of a rotator cuff tear.  (R. at 867.)  A follow-up physical examination showed "near full active and passive range of motion within 20 [degrees] of the contralateral side [and] no evidence of any ligamentuous laxity."  Plaintiff refused recommended injection therapy "because they have never helped in the past," and opted for subacromial decompression.  (R. at 866.)

### 4. F. Paul Degenova, D.O.

Plaintiff presented to orthopaedic specialist, Dr. Degenova on February 17, 2012. Plaintiff complained of low back pain that she has had "for years."  (R. at 924-25.)  Plaintiff reported that she had received no formal physical therapy and no injections.  On examination, Plaintiff had an antalgic gait, lumbar spine tenderness upon palpation, and limited range of motion.  Dr. Degenova indicated that the images of Plaintiff's cervical spine showed "very mild degenerative changes . . . with a little narrowing of C6-7 interspace" and that the images of the thoracic spine showed "mild spondylitic degenerative changes . . . with slight scoliosis."  (R. at 926.)  Dr. Degonova also observed that Plaintiff had full motor strength, symmetric deep tendon reflexes, and intact sensation.  (R. at 924-25.)

### 5. WorkLife

Upon referral from Dr. Dyar, Plaintiff underwent a functional capacity assessment in January 2013.  (R. at 944-50.)  Chris Miller, OTR/L reported that during this evaluation, Plaintiff "[c]an do more physically at times than was demonstrated during this testing day.  Any final

vocational or rehabilitation decisions for [Plaintiff] should be made with this in mind."  (R. at 945.)  Mr. Miller also reported that "[o]verall test findings, in combination with clinical observations, suggest that considerable question should be drawn to the reliability and accuracy of [Plaintiff]'s reports of pain and disability."  (*Id.*)  He further indicated that the results of the Waddell's test suggested "the presence of inorganic symptoms regarding her reports of pain and disability."  (*Id.*)  Mr. Miller added that "numerous clinical inconsistencies were noted both in her display of pain/discomfort and her functional tolerances."  (R. at 946.)

Mr. Miller found that Plaintiff's "main functional problems were psychological in nature. She reported having an anxiety disorder that interferes with her functioning" and she specifically mentioned having to use the bathroom all the time when she left her home.  (*Id.*)  Mr. Miller noted, however, that the evaluation lasted 4 hours and 38 minutes and yet she took only "a few breaks to use the restroom, which she attributed to anxiety. Each trip lasted under 3 minutes, and only presented as a very minor disruption to the exam."  (*Id.*)  He also noted that Plaintiff drove herself to the exam.

Mr. Miller reported that Plaintiff refused to increase weight for several of the activities. (R. at 946.)  Plaintiff displayed 4/5 strength in most of her extremities and some reduced range of motion.  (R. at 945-47.)  Mr. Miller noted that Plaintiff "was able to sit for the majority of testing (2 hrs, 46.5 minutes), with the longest sitting duration recorded at 31 minutes."  (R. at 948.)  She also was able to stand for 1 hour and 34 minutes "during the time of the evaluation with a recorded segment of 46 minutes spent upright without sitting or lying down."  (*Id.*)  He also noted that following a ten-minute segment on the treadmill, Plaintiff was able to immediately ambulate to a different department "with very little observed functional difficulty other than a

10

slow pace." (*Id.*)  He noted that she did, however, present with antalgic movement in her right hip during the wing phase of her gait.

Mr. Miller opined that Plaintiff "demonstrated physical abilities most consistent with the Sedentary Physical Demand Level" and noted that she demonstrated abilities beyond this level on occasion.  After noting that she demonstrated the ability to perform at the sedentary level, he concluded that he could make "no further formal recommendations regarding [Plaintiff's] true abilities . . . [d]ue to the inconsistencies noted in [her] reliability of reports and effort." (*Id.*)

**6.      State-Agency Evaluation**

On March 25, 2011, state-agency physician Gerald  Klyop, M.D., reviewed the record and assessed Plaintiff's physical functioning capacity.  (R. at 123-27.)  Dr. Klyop opined that Plaintiff could lift, carry, push, and pull up to 20 pounds occasionally and 10 pounds frequently; sit about six hours in an eight-hour work day; and stand and/or walk about four hours in an eight-hour work day.  (R. at 123.)  Dr. Klyop found that Plaintiff was also limited to only occasionally pushing, pulling, and using foot controls with her right leg.  (*Id.*)  Dr. Klyop also found that Plaintiff could occasionally kneel, crouch, crawl, and climb ramps and stairs but never climb ladders/rope/scaffolds, but should avoid even moderate exposure to hazards (machinery, heights, etc.).  (R. at 123-24.)

On September 2, 2011, state-agency physician Maureen Gallagher, D.O., M.P.H., reviewed the record upon reconsideration.  (R. at 141-43.)  Dr. Gallagher opined that Plaintiff could lift, carry, push, and pull up to 50 pounds occasionally and 25 pounds frequently; sit about six hours in an eight-hour work day; and stand and/or walk about six hours in an eight-hour work day.  (R. at 141.)  Dr. Gallagher agreed with Dr. Klyop that Plaintiff was limited to only

occasionally pushing, pulling, and using foot controls with her right leg. (*Id.*) Dr. Gallagher also found that plaintiff could frequently kneel and climb ramps and stairs, occasionally crawl but never climb ladders/rope/scaffolds, but should avoid concentrated exposure to the operation of hazardous machinery, and uneven terrain due to her right knee condition. (R. at 141-42.)

**B. Mental Impairments**

### 1. New Horizons

Plaintiff sought mental health treatment at New Horizons on August 29, 2011. (R. at 736-40.) During the intake evaluation, she complained to psychiatrist Anne S. Davidson, M.D., of panic attacks, nightmares from being molested and raped, and waking up crying and vomiting. She said she gets hives when she leaves her house, and frequently vomits and has diarrhea. She represented that she could not tolerate being away from her son. She also said that she has to find bathrooms wherever she is to vomit or have diarrhea and that she vomits after everything she eats, but that she can go days without eating. She indicated that she takes her son to school, but has to go to the bathroom at the school and has had accidents in the car. She reported she has also had to leave the pool due to sweating. Plaintiff stated that she was unable to work due to her hands shaking.

Plaintiff further reported that she cleans her home obsessively and bleaches her hands after taking out the trash or picking up dog waste. She added that she will vacuum the whole house and mop the kitchen floor if one piece of lint is on the floor. She described herself as "scatterbrained" with "many projects going on simultaneously" and "[s]ocially isolated." (R. at 736.) At the time of the evaluation, she reported that her medications included Cymbalta, Trazodone, Valium, and Mobic. (R. at 737.)

Dr. Davidson found Plaintiff to be well groomed and moderately overweight, with clear speech and average demeanor and eye contact.  (R. at 738.)  She described Plaintiff's thought process as logical, her mood as anxious, and her affect as constricted, but noted that Plaintiff was cooperative and of average intelligence.  (*Id.*)  Dr. Davidson diagnosed Plaintiff with delayed Post Traumatic Stress Disorder ("PTSD"), panic disorder with agoraphobia, mood disorder, an eating disorder, and obsessive compulsive disorder ("OCD").  (R. at 739.)  Plaintiff was prescribed Cymbalta and Klonopin.  (*Id.*)

On September 9, 2011, Plaintiff reported that she was getting little sleep due to her son experiencing "night terrors" and that she "[f]eels like she is at her wits end" with her son.  (R. at 734.)  Dr. Davidson found Plaintiff's thought process to be logical and reality based and noted that she was cooperative and had fair insight and judgment.  Dr. Davidson also indicated that Plaintiff's mood was depressed and anxious.  (*Id.*)  Dr. Davidson discontinued Plaintiff prescribed medication of Klonopin, continued Cymbalta, and added Xanax and Minipress.  (R. at 735.)

On September 19, 2011, Plaintiff reported that the medications had "helped decrease the intensity of the dreams and flashbacks."  (R. at 732.)  She also reported experiencing headaches she thought were attributable to sinus issues because she had been sneezing a lot.  Plaintiff indicated that she experienced no side effects from the medications.  Dr. Davidson continued her medications.  (R. at 732-33.)

On September 19, 2011, Dr. Davidson identified Plaintiff's diagnoses as PTSD and panic disorder with agoraphobia.  (R. at 712-17.)  Dr. Davidson found that Plaintiff did not have psychosis, but noted that she reported having flashbacks and nightmares.  She also noted

13

Plaintiff complained of not wanting to get out of bed and being "on edge," but that she observed that Plaintiff was alert and oriented.  (R. at 712.)  Dr. Davidson also noted that Plaintiff had low frustration tolerance, was impatient, and had decreased concentration.  When responding to significant restrictions of daily activity, Dr. Davidson responded that Plaintiff had anxiety that often prompted her to have diarrhea or vomit.  Dr. Davidson indicated that Plaintiff's symptoms had increased in severity over the past year.  At the time Dr. Davidson completed this assessment, she noted that Plaintiff had minimal response to treatment, but that her medication had been adjusted to reduce the nightmares, flashbacks, and panic attacks, as well as to improve her mood and provide mood stability.  (R. at 712-13, 717.)  She also indicated that Plaintiff had extremely low stress tolerance because should could not take her child to school without panicking and having diarrhea and vomiting due to anxiety.  (R. at 713.)

Plaintiff returned in December 2011, reporting that she had stopped taking Cymbalta and had ran out of Xanax.  On mental status examination, Plaintiff was found to be coherent, goal directed, cooperative, with intact cognition with good insight and judgment.  (R. at 730.)  In January 2012, Plaintiff again reported that she was taking her medications with no side effects. (R. at 726.)

Plaintiff continued to treat at New Horizons through at least December 11, 2012. Her medication was adjusted during this time.  (R. at 725.)  During the December 11, 2012 visit, Plaintiff continued to complain of anxiety, depression, and insomnia.  (R. at  844.)  Her medications included Seroquel, Klonopin, Vistaril, Inderal and Prozac.  (R. at 844-45.)

2.    Marc Miller, Ph.D.

On January 24, 2011, Plaintiff was evaluated for disability purposes by Dr. Miller.  (R. at 649-54.)  Plaintiff was on time and drove herself.  Dr. Miller described her as "cooperative, friendly, [and] mannerly."  (R. at 652.)  She reported difficulty with chronic anxiety and depression.  She noted tendencies to withdraw and moodiness.  (R. at 652.)  Plaintiff also reported that she becomes overwhelmed easily and placed her stress level at a level ten on a scale from one to ten.  (R. at 653-54.)

On mental status examination, Plaintiff had average appearance and grooming with good hygiene.  She was found to be cooperative with good eye contact.  Plaintiff's speech was within normal limits.  She was tearful during the interview.  Plaintiff recalled 3 of 3 items after 5 minutes.  Plaintiff recalled 7 numbers forward and 4 backward.  There were no delusions or hallucinations observed.  Dr. Miller found Plaintiff had normal intelligence, normal memory, and fair to normal concentration.  (R. at 653.)  Plaintiff demonstrated good insight and judgment, fair to normal motivation, and fair to good social adaptation.  (R. at 654.)

Plaintiff reported experiencing panic attacks a couple of times per week of unknown etiology.  She further indicated that she "has no trouble being around crowds, people, [and] she can go into stores with no difficulty."  (R. at 653.)  She reported that her mother performed most of her chores and shopping due to her knee problems.  (R. at 654.)

Dr. Miller diagnosed Plaintiff with chronic pain disorder with psychological factors, moderate to severe dysthymic disorder, panic disorder without agoraphobia, and moderate generalized anxiety disorder.  He assigned Plaintiff a Global Assessment of Functioning ("GAF") score "during past week" of 55.  (R. at 649.)

15

Dr. Miller opined that Plaintiff's ability to understand is not impaired, remember, and carry out routine job instructions indicate no impairment; her ability to interact with others indicates no impairment; and her ability to maintain attention span and concentration was mildly impaired. He further opined that Plaintiff's ability to withstand stress and pressure associated with day-to-day work activities was markedly impaired because Plaintiff reported being easily upset, impatient, and becoming overwhelmed. (R. at 654.)

### 3. State-Agency Evaluations

On February 3, 2011, after review of Plaintiff's medical record, Mel Zwissler, Ph.D., a state-agency psychologist, assessed Plaintiff's mental condition and opined that Plaintiff had mild restrictions in her activities of daily living; mild difficulties in maintaining social functioning, and in maintaining concentration, persistence, or pace; with no episodes of decompensation of an extended duration. (R. at 121.) He further determined that the evidence did not establish the presence of the "C" criteria. (*Id.*) He found that Plaintiff could "adapt to minor changes in a calm static setting with few changes." (R. at 125.) Dr. Zwissler concluded that Plaintiff's allegations were partially credible, noting that while Plaintiff alleged that she did not drive, she drove alone to her consultative exam. (R. at 122.) Dr. Zwissler gave "limited" weight to Dr. Miller's opinion. (*Id.*) He concluded,

> [Plaintiff]'s daily life [is] exposed to a variety of changes and potential stressors while performing all personal care and child care and pet care without any assistance. She alleges she doesn't drive but she drove alone to [the consultative evaluation], does shop in stores, and was cooperative at [the consultative evaluation] with [Dr. Miller]. In doing the above activities there are no references to disruptive stress episodes occurring. Thus, a moderate limitation in stress adaptation to change appears supported rather than the opined marked limitation suggested by [Dr. Miller].

(R. at 125.)

On September 22, 2011, Carl Tishler, Ph.D., reviewed the record upon reconsideration and essentially affirmed Dr. Zwissler's assessment.  (R. at 139-45.)  He added that Plaintiff "[r]etains the ability to understand and remember instructions for simple repetitive tasks and to maintain attention, concentration, persistence and pace for simple, repetitive tasks without demand for fast pace" and that she "[w]ould perform best in [a] setting with infrequent, superficial interaction with others."  (R. at 144.)  Dr. Tischler also opined that Plaintiff would could adapt to minor changes in a calm static setting with few changes.  (*Id.*)

## IV.    THE ADMINISTRATIVE DECISION

On April 4, 2013, the ALJ issued his decision.  (R. at 27-44.)  Plaintiff met the insured status requirements through March 31, 2013.  At step one of the sequential evaluation process,[1] the ALJ found that Plaintiff had not engaged in substantially gainful activity since her alleged onset date of January 1, 2010.  (R. at 32.)  The ALJ found that Plaintiff had the severe

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. § 416.920(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.    Is the claimant engaged in substantial gainful activity?
2.    Does the claimant suffer from one or more severe impairments?
3.    Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.    Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.    Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

impairments of obesity; mild lumbar, thoracic, and cervical degenerative disc disease; right knee

arthritis with history of total knee replacement; migraines; restless leg syndrome; recurrent

abdominal hernias; depression; anxiety; post-traumatic stress disorder (PTSD); panic disorder

with agoraphobia; obsessive compulsive disorder (OCD); and eating disorders.  (R. at 32-33.)

He further found that Plaintiff did not have an impairment or combination of impairments that

met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart

P, Appendix 1.  (R. at 33.)  At step four of the sequential process, the ALJ set forth Plaintiff's

RFC as follows:

> After careful consideration of the entire record, the [ALJ] find[s] that the claimant
> has the residual functional capacity to perform sedentary work as defined in 20 CFR
> 404.1567(a) and 416.967(a) except she can never climb ladders, ropes, or scaffolds;
> can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs;
> and must avoid all exposure to operational control of moving machinery, unprotected
> heights, and hazardous machinery.  Further, she is limited to simple, routine,
> repetitive tasks in a low-stress work environment, defined as one involving only
> occasional decision making or changes in routine, with no interaction with the public
> and only occasional interactions with coworkers.

(R. at 35-36.)  In reaching this determination, the ALJ accorded "significant weight" to the

opinions of the state-agency reviewing physicians, Drs. Klyop and Gallagher, finding that the

opinions were "consistent with the claimant's history of knee problems and spinal degeneration

with intact strength but limited range of motion."  (R. at 39.)  Taking into consideration

Plaintiff's obesity and her recurrent hernias, however, the ALJ limited Plaintiff to sedentary

work.  (*Id.*)  The ALJ accorded "little weight" to the opinion of Chris Miller, OTR/L from

WorkLife who performed the functional capacity assessment in January 2013.  (*Id.*)  The ALJ

also accorded "little weight" to the opinion of Dr. Dyar, noting her limited treatment relationship

with Plaintiff, the fact that she was not a specialist, and that her opinion is unsupported by any medical evidence.  (R. at 40.)

Turning to Plaintiff's mental health impairments, the ALJ assigned "some weight" to Dr. Miller's assessment, adopting the restrictions limiting Plaintiff to simple, routine, repetitive tasks in a low-stress work environment, but not the marked limitation in withstanding the stress and pressure associated with day-to-day work activities.  (R. at  41-42.)  The ALJ assigned "little weight" to Dr. Davidson's assessment, finding that at the time she completed the assessment, she had been treating Plaintiff for less than a month, and her examination notes showed only mildly impaired attention/concentration and a depressed and anxious mood, with no significant thought abnormalities or signs of significant anxiety.  (R. at 42.)

Relying on the VE's testimony, the ALJ concluded that Plaintiff can perform jobs that exist in significant numbers in the national economy.  (R. at 42-43.)  He therefore concluded that Plaintiff was not disabled under the Social Security Act.  (*Id.*)

## V.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.   ANALYSIS

In her Statement of Errors, Plaintiff first challenges the ALJ's consideration and treatment of the opinions expressed by her treating psychiatrists and Dr. Dyer.  Plaintiff next challenges the ALJ's credibility assessment, asserting that the ALJ failed to properly consider several of her alleged limitations.  Finally, Plaintiff maintains that the ALJ improperly concluded that she can perform sedentary work and erroneously relied upon VE testimony to incomplete hypotheticals in formulating the RFC.  The Undersigned considers each of these contentions of error in turn.

**A.     Consideration of Drs. Davidson's and Dyar's Opinions**

Within this contention of error, Plaintiff asserts that the ALJ erred in assigning "little weight" to her treating psychiatrist at New Horizons because (1) the ALJ "mischaracterized the evidence when he found that she did not exhibit significant psychomotor agitation, panic, or any alleged vomiting or diarrhea at [her] consultative examination" and that none of her records noted any such observations; (2) the opinion was entitled to dispositive weight because it was not contradicted by other evidence or opinions; and (3) the ALJ's RFC failed to account to Plaintiff's agoraphobia.  Plaintiff does not, however, maintain that the ALJ erred in failing to accord controlling weight to Dr. Dyar's opinion, only that the opinion "should have received additional consideration."  (Pl.'s Statement of Errors 18, ECF No. 12.)

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(c).  The applicable regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . ."  20 C.F.R. § 416.927(c)(2);  *Blakley v. Comm'r of Soc. Sec*., 581 F.3d 399, 408 (6th Cir. 2009).  If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory

21

diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight."  20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements.  *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004).  Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors-namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion.

*Id*.  Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion."  20 C.F.R. § 416.927(c)(2).  Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Friend v. Comm'r of Soc. Sec*., 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted).  The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied."  *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.  *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45.  Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled."  *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 Fed. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242). There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision.  *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion evidence within the written decision).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity.  20 C.F.R. § 404.1527(d).  Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance.  20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

The Undersigned finds no error with the ALJ's consideration and weighing of New Horizons Psychiatrist Dr. Davidson.  The ALJ explained the weight assigned to Dr. Davidson as follows:

> I give little weight to the opinion of [Plaintiff's] treating psychiatrist set forth in September 2011.  At the time this provider completed the assessment, [s]he had been treating [Plaintiff] for less than a month.  Further, examination notes from [her] visits show only mildly impaired attention/concentration and a depressed and anxious mood, with no significant thought abnormalities or signs of significant anxiety.  In addition, [her] notes in the assessment appear to simply restate [Plaintiff's] subjective complaints rather than provide an objective, evidence-based assessment of her functioning.

(R. at 42.)

23

The ALJ offered good reasons for discounting Dr. Davidson's opinion. First, the ALJ properly considered that Plaintiff had treated with Dr. Davidson for less than a month. *See Wilson*, 378 F.3d at 544 (length of treatment relationship and frequency of examination relevant factors). Indeed, to even qualify as a treating source, the physician must have an "ongoing treatment relationship" with the claimant. 20 C.F.R. § 404.1502. *Kornecky v. Comm'r of Soc. Sec.*, No. 04-2171, 167 F. App'x 496, 506 (6th Cir. Feb. 9, 2006) ("[T]he relevant inquiry is . . . whether [claimant] had the ongoing relationship with [the physician] *at the time he rendered his opinion*. [V]isits to [the physician] *after* his RFC assessment could not retroactively render him a treating physician at the time of the assessment."); *see also Yamin v. Comm'r of Soc. Sec.*, 67 F. App'x 883, 885 (6th Cir. 2003) ("These two examinations did not give [the physician] a long term overview of [the claimant's] condition."). Here, following the initial intake visit, Plaintiff met with Dr. Davidson for one other visit and again on the day Dr. Davidson rendered her opinion.

Second, contrary to Plaintiff's assertions, the ALJ's observation that Dr. Davidson's examination notes do not reflect observations of symptoms as severe as Plaintiff alleges is correct. As the ALJ points out, despite Plaintiff's subjective reports of disabling agoraphobia, the notes of examiners and her physicians repeatedly observe that Plaintiff is in no acute distress, despite having to drive herself to her appointments. (*See* Dr. Dyer's treatment notes, R. at 889, 906, 918-19, 932-38 (repeatedly observing that Plaintiff was in no acute distress and displayed normal mood and affect); OTR/L Miller's WorkLife Assessment, R. at 944-50 (noting that inconsistencies between Plaintiff's allegations that she needed to use the bathroom all of the time when she left her home and his observations that she only needed to use the restroom a few times

24

for under three minutes each during a nearly five-hour exam to which she drove herself to); Dr. Davidson's evaluation notes R. at 730 (observing on mental status examination that Plaintiff was coherent, goal directed, cooperative, with intact cognition with good insight and judgment).) The Undersigned concludes that the ALJ did not err in discounting Dr. Davidson's opinions due the inconsistencies in her examination notes and the record.  *See* 20 C.F.R. § 404.1527(c)(3) (identifying "supportability" as a relevant consideration).

In addition, as the ALJ points out, Dr. Davidson's report appears to based upon Plaintiff's subjective self reports, which the ALJ found to be not credible.   For example, Dr. Davidson opines that Plaintiff has "extremely low stress tolerance as she can't take child to school [without] panicking [and] having diarrhea or vomiting due to anxiety," (R. at 713), an opinion clearly based upon Plaintiff's subjective reporting that the ALJ found to be not credible. The Undersigned finds that the ALJ did not err in discounting Dr. Davidson's opinion under these circumstances.  *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007) (holding that physicians' opinions are not due much weight when premised upon on reports made by a patient that the ALJ found to be incredible); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) ("Here, substantial evidence supports the ALJ's determination that the opinion of [the claimant's] treating physician was not entitled to deference because it was based on [the claimant's] subjective complaints, rather than objective medical data.").

The Undersigned likewise finds no error with the ALJ's consideration and weighing of Dr. Dyar's opinion.  Plaintiff fails to develop her challenge to the ALJ's consideration of Dr. Dyar's opinion beyond asserting that the ALJ "cherry-pick[ed]" portions of the WorkLife report. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("issues adverted to in a

perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones"). Contrary to Plaintiff's assertion, the ALJ thoroughly considered the record and the opinion evidence. Moreover, the ALJ offered numerous good reasons for assigning "little weight" to Dr. Dyar's opinion. (*See* R. at 40 (citing Plaintiff's testimony that the nurse filled out part of the form based upon answers to questions she provided on the telephone to the nurse; observing that the WorkLife opinion upon which Dr. Dyar's opinion was premised was unreliable in the opinion of the WorkLife examiner; citing the infrequency of Plaintiff's treatment with Dr. Dyar and that she is not a specialist; and noting that some of the limitations opined are completely unsupported by any record medical evidence).)

In sum, the Undersigned finds no error with the ALJ's consideration and weighing of Drs. Davidson's and Dyar's opinions. It is therefore **RECOMMENDED** that Plaintiff's first contention of error be **OVERRULED**.

## B.     Credibility Assessment

Plaintiff next challenges the ALJ's credibility assessment. According to Plaintiff, the ALJ erred in finding that Plaintiff did not take pain medication because she did not like how it felt, in concluding that Plaintiff's alleged vomiting and diarrhea were not supported by medical evidence, in considering that she compulsively cleaned her home to discredit her alleged limitations in her activities of daily living, and in failing to consider the side effects of her medications.

The Sixth Circuit has provided the following guidance in considering an ALJ's credibility assessment:

> Where the symptoms and not the underlying condition form the basis of the disability claim, a two-part analysis is used in evaluating complaints of disabling pain. 20 C.F.R. § 416.929(a); *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001); *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994). First, the ALJ will ask whether the there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms.  20 C.F.R. § 416.929(a). Second, if the ALJ finds that such an impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities.  *Id.*

*Rogers*, 486 F.3d at 247.

"The ALJ's assessment of credibility is entitled to great weight and deference, since he [or she] had the opportunity to observe the witness's demeanor." *Infantado v. Astrue*, 263 F. App'x 469, 475 (6th Cir. 2008) (citing *Walters v.  Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)); *Sullenger v. Comm'r of Soc. Sec.*, 255 F. App'x 988, 995 (6th Cir. 2007) (declining to disturb the ALJ's credibility determination, stating that: "[w]e will not try the case anew, resolve conflicts in the evidence, or decide questions of credibility" (citation omitted)).  This deference extends to an ALJ's credibility determinations "with respect to [a claimant's] subjective complaints of pain." *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009) (quoting *Siterlet v. Sec'y of Health & Hum. Servs.*, 823 F.2d 918, 920 (6th Cir.1987)).  Despite this deference, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters*, 127 F.3d at 531.  Furthermore, the ALJ's decision on credibility must be "based on a consideration of the entire record." *Rogers*, 486 F.3d at 247 (internal quotation omitted).  An ALJ's explanation of his or her credibility decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* at 248; *see also Mason v. Comm'r of Soc. Sec. Admin.*, No. 1:06–CV–1566, 2012 WL 669930, at *10 (N.D. Ohio Feb. 29,

27

2012) ("While the ALJ's credibility findings 'must be sufficiently specific', *Rogers*, 486 F.3d at 248, the intent behind this standard is to ensure meaningful appellate review.").

"Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters*, 127 F.3d at 531.  In addition, the Regulations list a variety of factors an ALJ must consider in evaluating the severity of symptoms, including a claimant's daily activities; the effectiveness of medication; and treatment other than medication.  20 C.F.R. § 404.1529(c)(3); SSR 96–7p, 1996 WL 374186 (July 2, 1996); *but see Ewing v. Astrue*, No. 1:10–cv–1792, 2011 WL 3843692, at *9 (N.D. Ohio Aug. 12, 2011) (suggesting that although an ALJ is required to consider such factors, he or she is not required to discuss every factor within the written decision) (Report and Recommendation later adopted).

In the instant action, the Undersigned finds that substantial evidence supports the ALJ's credibility assessment. In assessing Plaintiff's credibility, the ALJ properly considered the lack of significant objective medical evidence findings, examination notes, the level of intervention and treatment Plaintiff sought, and her activities of daily living.

With regard to Plaintiff's alleged physical impairments, as the ALJ points out, Plaintiff's MRIs showed only some mild degenerative and spondylotic changes, and a December 2012 examination revealed that she retained full normal lumbar range of motion, full internal and external rotation, and 5/5 motor strength in all major muscle groups," good sensation, as well as "full knee range of motion without any evidence of effusion."  (R. at 39-40, 864.)  He further pointed out that the observed results during her WorkLife examination showed that she was able to do more than she had alleged and added that the examiner stated that she could even do more

28

than she demonstrated.  With regard to her alleged mental impairments, the ALJ again noted that although her psychiatric records documented complaints of symptoms of panic attacks, vomiting, and diarrhea, those records did not reflect any actual observations of such symptoms and instead reflected that only mild symptoms were observed.  (R. at 41-42.)

The ALJ also considered frequency and nature of Plaintiff's treatment for her physical impairments.  For example, the ALJ noted that Plaintiff has not sought treatment for her alleged knee pain since mid-2011, that she has not received regular treatment or any physical therapy for her alleged back and knee pain, that she alleged that she does not take pain medications because she does not like how they feel, and that she did not see a neurologists for alleged headaches and only sought sporadic treatment for them.  Contrary to Plaintiff's assertions, the ALJ properly considered the frequency with which she sought treatment and the conservative nature of the treatment provided.  *See Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x, 719, 727 (6th Cir. 2013) (minimal or lack of treatment is valid reason to discount severity); *Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 931 (6th Cir. 2007) ("The ALJ properly considered as relevant the fact that [the claimant's] medical records did not indicate that [claimant] received significant treatment . . . during the relevant time period."); *cf.*, *Lester v. Soc. Sec. Admin.*, 596 F. App'x 387, 389 (6th Cir. 2015) (concluding that ALJ reasonably discounted a doctor's opined limitations where, among other things, the claimant was receiving conservative treatment).

The ALJ also properly considered Plaintiff's activities of daily living in assessing her credibility.  *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) ("The administrative law judge justifiably considered [the claimant's] ability to conduct daily life activities in the face of his claim of disabling pain."); *Walters*, 127 F.3d at 532 ("An ALJ may

also consider household and social activities engaged in by the claimant in evaluating a claimant's assertions of pain or ailments.").  For example, the ALJ pointed out that Plaintiff provides significant care for her young, disabled son, including bathing him, dressing him, preparing his meals, and keeping him entertained.  He also noted her reported obsessive cleaning activities despite her physical limitations.  The ALJ also considered that Plaintiff lives in an home with at least twenty-three stairs and is able to drive her son to school everyday, drive to doctor's appointments, and shop with her mother.  He also discussed Plaintiff's performance on the nearly five-hour examination, noting that "she did not exhibit significant psychomotor agitation, panic, or any alleged vomiting or diarrhea at this examination."  (R. at 41.)

Finally, contrary to Plaintiff's assertions, the ALJ did consider Plaintiff's testimony concerning the alleged side effects of her medications and even included additional limitations in her RFC to account for the allegations of side effects that he found credible.  (*See* R. at 39.)

In sum, the Undersigned finds that substantial evidence supports the ALJ's credibility assessment.  It is therefore **RECOMMENDED** that the Court decline to disturb the ALJ's credibility assessment and **OVERRULE** Plaintiff's second contention of error.

C. **RFC Limitation to Sedentary Work and Reliance on the VE's Testimony**

Within this final contention of error, Plaintiff maintains that the hypothetical question the ALJ posed to the VE failed to include any of the limitations to her range of motion such that the ALJ improperly relied upon the testimony.  (Pl.'s Statement of Errors 20, ECF No. 12.)  In an earlier portion of her brief, Plaintiff also challenges the ALJ's RFC determination that she is able to perform work at the sedentary level of exertion.  (*Id*. at 17.)  According to Plaintiff, she is incapable of sedentary work because such work contemplates occasionally standing and walking.

(Pl.'s Statement of Errors 17, ECF No. 12.)  Plaintiff submits that her physicians' examination notes reflecting her complaints of pain and limitations to her range of motion throughout her lower back and lower extremities demonstrate that she is incapable of sedentary work.  (*Id.*)

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments."  *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a).  The determination of RFC is an issue reserved to the Commissioner.  20 C.F.R. §§ 404.1527(e), 416.927(e).  Nevertheless, substantial evidence must support the Commissioner's RFC finding.  *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010).

The Undersigned finds that substantial evidence supports the ALJ's RFC determination that Plaintiff can perform work at the sedentary level of exertion.  For example, the ALJ assigned "significant weight," (R. at 39), to reviewing physicians Drs. Klyop's and Gallagher's opinions that Plaintiff was able to perform at level greater than the sedentary level.  (R. at 123-27, 141-43.)  In addition, in June 2012, Dr. Custer noted that Plaintiff was able to stand and ambulate without difficulty.  (R. at 897-98.)  Consistently, the examiner from WorkLife observed that Plaintiff standing and ambulating "with very little observed functional difficulty," opined that she "demonstrated physical abilities most consistent with the Sedentary Physical Demand Level," and added that she demonstrated abilities beyond this on occasion.  (R. at 948.)  Finally, as the ALJ points out, Plaintiff's household activities undermine her allegations of inability to ambulate.

Plaintiff's challenges to the hypothetical question the ALJ posted the VE is equally unavailing.  "In order for a VE's testimony to constitute substantial evidence that a significant

number of jobs exists, the questions must accurately portray a claimant's physical and mental impairments." *Cole*, 661 F.3d at 939.  The Undersigned finds that the ALJ's hypothetical question incorporated all of the limitations the ALJ found credible and supported by the evidence and, was therefore proper.  In formulating the hypothetical, an ALJ is only "required to incorporate those limitations accepted as credible by the finder of fact."  *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).  Here, the ALJ did not find Plaintiff's allegations of limitation beyond that set forth in the RFC to be credible.  Accordingly, because the ALJ's hypothetical question incorporated all of the limitations he ultimately included in Plaintiff's RFC, he did not err in relying on the VE's testimony.

It is therefore **RECOMMENDED** that the Court **OVERRULE** Plaintiff's final contention of error.

## VII.    CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner of Social Security's decision.

## VIII.    PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Response to objections must be filed within fourteen (14) days after being served with a copy.

Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: January 27, 2016                             /s/ *Elizabeth A. Preston Deavers*
                                                ELIZABETH A. PRESTON DEAVERS
                                                UNITED STATES MAGISTRATE JUDGE